**Maureen JOHNSON, Plaintiff,**

v.

**PENSKE TRUCK LEASING CO., Defendant.**

**Civil Action No. 96–676 (AJL).**

United States District Court, D. New Jersey.

Nov. 18, 1996.

Rachel A. Onufrak, Joseph J. Bell & Associates, Denville, NJ, for Plaintiff.

Patrick M. Stanton, Stanton, Hughes, Diana & Zucker, P.C., Florham Park, NJ, for Defendant.

## OPINION

LECHNER, District Judge.

This is an employment discrimination action brought by plaintiff Maureen Johnson ("Johnson") against defendant Penske Truck Leasing Company ("Penske"). Jurisdiction

is alleged pursuant to 28 U.S.C. § 1332 and appears to be proper.

Johnson alleges Penske, her former employer, unlawfully discriminated against her on the basis of age and gender when Penske did not promote her in December 1993. Johnson seeks compensatory and punitive damages, attorney's fees, costs of suit and other such equitable relief as deemed proper. On 7 December 1995, Johnson filed a two count complaint (the "Complaint") in the Superior Court of New Jersey, Law Division, Morris County, alleging claims of gender discrimination and age discrimination in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1, *et seq.* On 7 February 1996, Penske removed the action to the United States District Court for the District of New Jersey.

On 14 August 1996, Penske submitted, pursuant to Rule 12N, Appendix N ("Rule 12N") of the General Rules for the District of New Jersey, a motion for summary judgment (the "Motion for Summary Judgment").[1] For the reasons set forth below, the Motion for Summary Judgment is granted.

*Facts*

A. *The Penske Corporation*

Penske is a national truck rental and leasing company which has field operations located throughout the United States and parts of Canada. 17 June 1996 Certification of Joseph Moleski ("Moleski Cert."), attached to Cerra Cert. as Exhibit F, ¶ 3. Penske's corporate headquarters are located in Reading, Pennsylvania. Moleski Cert., ¶ 3. Penske's organizational structure is divided into four operating regions: the Northeast, Southeast, Central and Western regions. Moleski Cert., ¶ 4. Each region is headed by a Vice President. Moleski Cert. ¶ 4. Each region is subdivided into three to four smaller geographic territories (an "Area"), headed by an Area Vice President. Moleski Cert., ¶ 4.

These Areas are further subdivided into districts (a "District"). Moleski Cert., ¶ 5. The number of Districts in each area varies between five and eleven, depending upon the population and demand of the Area. Moleski Cert., ¶ 5. Within each District, a District Manager oversees the overall operations of the District. Moleski Cert., ¶ 5. The District Manager supervises the various job functions including commercial lease activity, commercial and consumer rental activity, the service and maintenance functions and office administration. Moleski Cert., ¶ 5. Four Penske employees directly report to the District Manager: the District Service Manager, the District Rental Manager, the Lease Sales Representative and the District Controller (now known as the District Administrator). Moleski Cert., ¶ 6.

The District Service Manager is largely responsible for supervising the maintenance of the vehicles leased and rented at the field location. Moleski Cert., ¶ 7. The Lease Sales Representative is primarily responsible for supervising lease sales, including the servicing of existing accounts and the soliciting of new lease business. Moleski Cert., ¶ 7. The District Rental Manager is primarily responsible for managing the rental functions. Moleski Cert., ¶ 8. At the time Johnson held the District Controller position, the District Controller's primary duty was to oversee the financial and administrative functions of the District. Moleski Cert., ¶ 9. These responsibilities included training and supervising clerical staff, managing the accounting function at the district level, interacting with customers regarding licensing,

---

1. In support of the Motion for Summary Judgment, Penske submitted: Notice of Motion for Summary Judgment; Brief in Support of Motion for Summary Judgment ("Moving Brief"); Defendant's Statement Pursuant to General Rule 12G ("Penske 12G Statement"); Certification of Suzanne M. Cerra ("Cerra Cert."), dated 18 June 1996, with Exhibits A through I attached; Supplemental Certification of Suzanne M. Cerra ("Supp. Cerra Cert."), dated 17 July 1996, with Exhibits A through H attached; Defendant's Reply Brief ("Penske Reply Brief") and a Proposed Form of Order Granting the Motion for Summary Judgment.

In opposition to the Penske Motion for Summary Judgment, Johnson submitted: Brief in Opposition to the Motion for Summary Judgment ("Opposition Brief"); Certification of Rachel Onufrak ("Onufrak Cert."), dated 1 July 1996 with Exhibits A through R attached; Plaintiff's Statement Pursuant to General Rule 12G ("Johnson 12G Statement"); and a Proposed Form of Order Denying the Motion For Summary Judgment.

billing, and other administrative issues. Moleski Cert., ¶ 9.

Of the employees that report to the District Manager, the District Service Manager receives the highest base salary, plus a bonus and a company car. Moleski Cert., ¶ 10. The Lease Sales Representative receives a base salary, a company car and commission based on the sale activity he or she generates. Moleski Cert., ¶ 10. The District Rental Manager receives a base salary, a company car and is eligible for a bonus. Moleski Cert., ¶ 10. Finally, the District Controller receives only a base salary comparable to that of the District Rental Manager, but no company car. Moleski Cert., ¶ 10.

Districts may be further subdivided into branches (a "Branch") which are similarly structured to the District to which it reports. Moleski Cert., ¶ 11. One key difference is that a Branch does not employ its own Controller, but rather the District Controller performs the functions for the Branch. Moleski Cert., ¶ 11. The primary responsibilities of a Branch Manager are to oversee the operations of the Branch, which include supervision of the employees that directly report to the Branch Manager: the Service Manager, Lease Sales Representative and the Rental Manager. 6 June 1996 Deposition of Joseph Moleski ("Moleski Dep.Tr."), attached to Onufrak Cert. as Exhibit E; attached to Supp. Cerra Cert. as Exhibit D, 87:1–9.

Branch Manager is an operational and sales oriented position. Moleski Dep.Tr. 86:6–13. Operational functions constitute sixty percent of a Branch Manager's responsibilities and the remaining forty percent are devoted to sales, including account management, devising sales strategy, and assisting the Lease Sales Representatives in business planning. Moleski Dep.Tr. 91:1–5, 92:17–19, 93:14–16. Approximately ten to twenty-five percent of a Branch Manager's time is devoted to person-to-person sales. Moleski Dep. Tr. 93:25; 20 March 1996 Vol. 2 Deposition of Maureen Johnson ("Johnson Dep.Tr. 2."), attached to Onufrak Cert. as Exhibit B; attached to Cerra Cert. as Exhibit B; attached to Supp. Cerra Cert. as Exhibit A, 111:7 to 115:13. Controller responsibilities consume approximately ten to fifteen percent of a Branch Manager's time. Johnson Dep.Tr. 2.111:17–20.

### B. *Johnson's Employment at Penske*

#### 1. *Employment History*

Johnson began working for Penske in 1979. 14 March 1996 Vol. 1 Deposition of Johnson (the "Johnson Dep.Tr. 1."), attached to the Onufrak Cert. as Exhibit A; attached to Cerra Cert. as Exhibit A, 38:12. At that time, Johnson was employed as a service clerk in a division of Penske called Penske GM, which is located in Ronkomkoma, New York. Johnson Dep.Tr. 1.38:1 to 1.39:15. Johnson was promoted to service administrator, where she was responsible for assisting individuals experiencing problems with their rented trucks, boats or other equipment. Johnson Dep.Tr. 1.44:1–15. When individuals with problems called Penske GM, Johnson fielded the phone calls, made independent assessments of the problem and then dispatched a mechanic to the scene. Johnson Dep.Tr. 1.45:3–8, 1.44:10–11, 1.46:8–16, 1.48:11–13. Johnson also prepared price quotations with regard to the necessary repairs, and was involved in billing and the warranty process. Johnson Dep.Tr. 1.49:11–13; 4 April 1996 Interrogatory Answers of Johnson ("Johnson Interrog.Ans."), attached to Onufrak Cert. as Exhibit G, 4(7). Johnson obtained knowledge of mechanics through this position and her attendance at diesel mechanic courses. Johnson Dep.Tr. 1.45:12–16; 1 July 1996 Certification of Johnson ("Johnson Cert."), attached to Onufrak Cert. as Exhibit Q, ¶ 3.

Johnson left Penske GM in 1982 when she relocated to New Jersey. Johnson Cert., ¶ 4. In 1984, Johnson was hired as an 800 line Rental Representative for Penske Truck Leasing. Johnson Cert., ¶ 5. In that position, Johnson received incoming calls, sold customers on the benefits of using Penske trucks, determined which type of truck would be most beneficial to the customer, answered concerns of customers, arranged for pick-up and drop off of trucks and applied the rental rate schedule to advise clients of their financial obligations. Johnson Cert., ¶ 5. John-

son also supervised a clerk performing similar responsibilities. Johnson Cert., ¶ 5.

After five months as an 800 line Rental Representative, Johnson accepted a position as a Warranty Claim Writer, which she held for approximately one year. Johnson Cert., ¶¶ 6–7. In that capacity, Johnson processed large volumes of warranty claims, presented them to component manufacturers for payment and negotiated controverted claims. Johnson Cert., ¶ 6. When this division relocated to Reading, Pennsylvania, Johnson declined to move. Johnson Cert., ¶ 7. Penske then promoted Johnson to the job of Assistant District Controller in Lodi, New Jersey. Johnson Cert., ¶ 7.

The primary duty of the Assistant District Controller was to work in a training mode alongside the District Controller. 14 May 1996 Deposition of Michael Marsiglia ("Marsiglia Dep.Tr."), attached to Onufrak Cert. as Exhibit D; attached to Cerra Cert. as Exhibit D; attached to Supp. Cerra Cert. as Exhibit E, 101:6–11. The eventual transition for an Assistant District Controller is to District Controller once the necessary skills have been acquired and a position is available. Marsiglia Dep.Tr. 101:6–11. Johnson remained in the Assistant District Controller position for eight months, and was then offered a position as a Rental Account Manager in April 1986. Johnson Cert., ¶ 8.

As a Rental Account Manager, Johnson was responsible for building a customer base at a new Penske location. Johnson Dep.Tr., 1.117:12–15. Johnson performed an area market survey and began marketing Penske services via telemarketing and direct mail. Johnson Cert., ¶ 8. Johnson also had supervisory responsibilities over several agent locations. Johnson Cert., ¶ 8. Johnson made sales calls with various Area and District Rental Managers and the Lease Sales Representative. Johnson Cert., ¶ 8. Johnson took several seminars at that time to improve her sales skills. Johnson Cert., ¶ 9. Johnson worked as a Rental Account Manager for nine months and was then offered a position as a District Controller. Johnson Cert., ¶ 10.

In January 1987, Johnson accepted the position of District Controller in Pine Brook, New Jersey; this position was offered without an interview. Johnson Dep.Tr. 1.134:14–20, 1.139:5, 1.143:2–4. The job was a promotion, with a pay raise. Johnson Cert., ¶ 10. As a District Controller, Johnson was responsible for the financial and administrative functions of the District, including assisting in the development and implementation of the District's business plan. Johnson Interrog.Ans., 5(5); Johnson Dep.Tr. 2.5:9–24, 2.6:1–5. Johnson managed the accounting functions of the District, such as accounts receivable, payroll and financial reporting. Johnson Cert., ¶ 10. The position enabled Johnson to engage in client contact with regard to licensing, billing and other administrative matters. Johnson Cert., ¶ 10. Johnson was also charged with the responsibility of training clerical personnel on the District's financial functions. Johnson Cert., ¶ 10.

In 1987, the Pine Brook office did not have a Rental Manager. Johnson Cert., ¶ 11. For a period of six to eight months while she was District Controller, Johnson assisted in performing the additional functions of the Rental Manager. Johnson Cert., ¶ 11. After the Rental Manager position was filled, Johnson continued to work alongside each Rental Manager daily during her tenure. Johnson Cert., ¶ 11. Johnson assisted in the implementation of sales promotion programs and customer follow-up programs, was involved in special projects such as training Controllers in other districts, organized and chaired Controller meetings, trained personnel at other locations on computer applications she developed, assisted her colleagues in the Service, Lease and Rental Departments as needed and she often involved herself in customer problem-solving. Johnson Cert., ¶ 11.

In her capacity as a District Controller, Johnson was supervised by Terry Dubowick ("Dubowick"). Johnson Dep.Tr. 1.143:2–7. When Dubowick left Pine Brook in June 1990, Moleski became her supervisor. Moleski Cert., ¶ 12. Moleski left his position as Pine Brook District Manager and was replaced by Bill Hopkins ("Hopkins") in September 1992. Moleski Cert., ¶ 12. Johnson was 43 years old when she applied for the Pine Brook Branch Manager position in December 1993. Johnson Cert., ¶ 16.

### 2. *Johnson's Performance Evaluations*

Johnson was selected as Controller of the Year in 1991 for the New York Metro Area and received favorable performance appraisals (the "Performance Appraisals") [2] throughout her employment at Penske. Johnson Cert., ¶¶ 11–12

#### a. *Appraisal—1984 to December 1987*

Johnson's Performance Appraisals from 1984 indicate she exceeded her job requirements. *See* Performance Appraisal, dated 25 June 1984, attached to Onufrak Cert. as Exhibit I. During the period from December 1986 to 1987, Johnson first occupied the District Controller position. Performance Appraisal, dated 12/15/86 to 12/15/87. Comments on Johnson's Performance Appraisal indicate "[Johnson] has proven, in a short period of time, her capabilities as a department manager and Controller.... She is fluent in the operations of a district and is quickly learning to become a capable financial planner." Her appraiser noted that her "[p]ast experience in service, warranty and rental operations is used daily, increasing her value to the District." Performance Appraisal, dated 12/15/86 to 12/15/87.

#### b. *Appraisal—December 1987 to January 1989*

The Performance Appraisal from the period of December 1987 to January 1989 indicates "[Johnson is] [a]lways wooking (sic) to improve.... [She] continues to develop and improve her capabilities as a Department Manager and Controller. [Johnson] is a true team player who works well with everyone in the District." Performance Appraisal, dated 12/15/87 to 1/15/89.

#### c. *Appraisal—January 1989 to April 1990*

Johnson received an overall score of "4+" on her Performance Appraisal, dated January 1989 to April 1990. Performance Appraisal, dated 1/15/89 to 4/15/90. Comments by her appraiser, Moleski, indicate Johnson is "[a]lways willing to help others and always living up to the commitments she makes.... [She] [m]akes decisions quickly.... [Johnson] [m]akes the right decision whether in favor of the customer or District.... [She is] [a]bsolutely the most self-motivated person I have ever worked with.... [Johnson] continues to develop skills that help every department manager.... [Johnson] has the personality and drive to succeed at any promotional level." Performance Appraisal, dated 1/15/89 to 4/15/90.

#### d. *Appraisal—May 1990 to January 1991*

Johnson received an overall score of 4.4 on her Performance Appraisal, dated May 1990 to January 1991. Performance Appraisal, dated 12/15/87 to 1/15/89. Comments on the appraisals include: "[Johnson] is well-liked and respected by subordinates, peers, and customers.... She is an effective department manager who delegates the workload and reviews progress very well...." Performance Appraisal, dated 12/15/87 to 1/15/89. The appraiser, Moleski, indicated Johnson needed more experience in sales and recommended participating in seminars and workshops. Performance Appraisal, dated 12/15/87 to 1/15/89.

#### e. *Appraisal—February 1991 to December 1991*

Johnson received a score of 4.5 on her Performance Appraisal, dated February 1991 to December 1991. Performance Appraisal,

---

**2.** The most recent Performance Appraisal forms used by Penske are divided into five sections. The first section provides general information such as the position title of the employee and the length of time in the position. The second section addresses results achieved. The appraiser lists the objectives the employee sought to achieve during the performance period and whether the objective was achieved. An area for comments by the appraiser is provided. The third section addresses performance ratings. The employee is rated on a scale of one (unsatisfactory) to five (exceptional) for a series of skills such as organization, communication, quality of work, decision making. An area for comments by the appraiser is provided. The fourth section is a performance narrative which delineates areas of strength. The fifth section lists measurable objectives for the next rating period.

dated 2/91 to 12/91. Comments in the performance appraisal include: "[Johnson] is a very flexible person who is always willing to accommodate someone who asks for her assistance.... [Johnson] is a very competent decisionmaker.... She avoids complacency, and continually strives for a greater degree of professionalism in her work." Performance Appraisal, dated 2/91 to 12/91

f. *Appraisal—January 1992 to September 1992*

Johnson received a 4.5 in her Performance Appraisal, dated January 1992 to September 1992. Performance Appraisal, dated 1/92 to 9/92. The appraiser, Moleski, noted that "[Johnson] has developed a confidence in her position that enables her to communicate in a clear and concise manner.... [Johnson] has developed innovative systems on the [D]istricts [computer] and trained personnel to utilize these programs. As a result, the office routine runs very smoothly." Performance Appraisal, dated 1/92 to 9/92.

g. *Appraisal—September 1992 to September 1993*

Johnson received an overall performance rating of 4.5 on her Performance Appraisal, dated September 1992 to September 1993. Performance Appraisal, dated 9/92 to 9/93. The appraiser, Hopkins, noted that: "[Johnson] has good relationship with all of Pine Brook's [c]ustomer base and is often called to solve a problem. She also checks in on the [c]ustomer on a timely basis to see if she can be of assistance.... [W]hen called upon [Johnson] will assist others to plan [and] organize.... She sees what has to be done and acts on it without being directed to do so.... She has involved herself more directly with our [c]ustomers and has proven to be an asset through her professional manner and has a positive attitude." Performance Appraisal dated 9/92 to 9/93.

h. *The Candidate Rating Form*

The Candidate Rating Form (the "Candidate Rating Form") is another tool used by Penske to assess the skill, promotability, re-

locatability and strength and weaknesses of the employee. Candidate Rating Forms, dated 1990 to 1993, attached to Onufrak Cert. as Exhibit I. The skills section is rated on a scale of one to five, with one being unsatisfactory and five being exceptional. Johnson received Candidate Rating Form assessments from 1990 to 1993. Johnson generally received skills ratings of 4 and 5 for the various skills described on the Candidate Rating Form. All of the Candidate Rating Forms indicate the next suitable position for Johnson is Branch Manager. All of the Candidate Rating Forms indicate Johnson would be ready for the Branch Manager position within three to eighteen months. The 1993 Candidate Rating Form indicates Johnson was then ready for the position. *See* Candidate Rating Forms.

All of the Candidate Rating Forms for Johnson indicate her strength to be her organization and initiative. With the exception of the 1993 Candidate Rating Form completed by Hopkins, all the Candidate Rating Forms indicate Johnson required improvement in Sales.[3] *See* Candidate Rating Forms.

C. *Penske Downsizing of the Pine Brook Office*

In late 1993, Penske decided to downsize the Pine Brook field office from a District to a Branch. Moleski Cert., ¶ 13. The Pine Brook location then reported as a Branch to the South Plainfield District. 17 June 1996 Certification of Robert Costello ("Costello Cert."), attached to Cerra Cert. as Exhibit H, ¶ 4. The decision to downsize the Pine Brook office was made by Costello, Vice President for the New York Metro Area, and Frank Mileto ("Mileto"), then–Senior Vice President of the Northeast Region. Costello Cert., ¶ 3. The decision to downsize was due to the lack of growth and revenue. Costello Cert., ¶ 4. The downsize decision was announced to the Pine Brook staff in late 1993. Moleski Dep.Tr. 143:10–13. Moleski told Johnson at a meeting after the announcement that maybe it was time for her to leave

---

3. The Candidate Rating Forms for the years 1990 to 1992 were completed by Moleski. The 1993 Candidate Rating Form was completed by Hopkins.

the company. Johnson Dep.Tr. 2.170:1–10.[4] Moleski also stated to Johnson at this meeting that "maybe Pine Brook will finally become a non-smoking location." Johnson Cert., ¶ 13. Because Johnson was the only smoker whose job status was questionable Johnson believed the statement applied to her. Johnson Cert., ¶ 13.

### D. *Result of the Downsizing*

The restructuring caused Hopkins, who was then the District Manager of the Pine Brook location, to be reassigned to a new location. Moleski Cert., ¶ 14. Hopkin's responsibilities were to be assumed by a Branch Manager (the "Branch Manager Position"). Moleski Cert., ¶ 14. The individual hired in the Branch Manager Position would report to Moleski, the current District Manager of South Plainfield. Moleski Cert., ¶ 14.

The District Controller position at the Pine Brook location, held by Johnson, was also eliminated through the restructuring. Johnson Cert., ¶ 14. The Controller functions were to be supervised by the District to which the Branch reported. Johnson Cert., ¶ 15. Penske had to decide who was going to retain the Controller position—Johnson, the Controller at the location to be downsized, or Calvin Smith ("Smith"), the Controller at the South Plainfield District. Johnson Cert., ¶ 15. Penske policy directed the position to be awarded to the employee based upon the person's experience and time with the company. Marsiglia Dep.Tr., 69:17–25. If both candidates were equal, Penske would eliminate the position at the downsized location. Marsiglia Dep.Tr. 69:17–25. Based on this policy, Smith was awarded the position. Johnson Cert., ¶ 15. Johnson was told

Penske would try to find her another job. Johnson Dep.Tr. 2.48:23 to 2.49:7, 2.65:12 to 2.66:12. Johnson stated her interest in the position of Branch Manager. Johnson Cert., ¶ 16.

The reorganization also resulted in a reduction of the clerical staff, whose functions were to be performed in the South Plainfield District. Marsiglia Dep.Tr. 72:5–9.

### E. *Filling the Branch Manager Position at Pine Brook*

In early December 1993, three candidates (the "Candidates") interviewed for the Branch Manager Position at the Pine Brook office—Johnson, Gene Raffa ("Raffa") and David Dean ("Dean"). Moleski Cert., ¶ 16. The Candidates were interviewed by Moleski, the District Manager of the South Plainfield office, Costello, the then-Area Vice President and Marsiglia, the Regional Human Resources Manager. Johnson Cert., ¶ 16. The job was a promotion for each of the Candidates. Johnson Cert., ¶ 16.

#### 1. *The Interview Process*

#### a. *Penske Policies*

Penske did not have formal policy guidelines for conducting interviews at the time the Candidates interviewed for the Branch Manager Position. Johnson Cert., ¶ 17. Penske did have a promotion policy in effect (the "Promotion Policy"). The Promotion Policy provides, in relevant part:

> It is the policy of Penske Truck Leasing to give consideration for promotion to all available, qualified candidates currently employed within the company. Special at-

---

**4.** The portion of the Johnson deposition referring to this statement reads as follows:

> Q At some point did Mr. Moleski tell you that he believed it was time for you to leave the company?
> A He stated that perhaps it was time for me to leave the company.
> Q When did Mr. Moleski say that to you?
> A Shortly after we had the meeting wherein they informed me that Pinebrook (sic) was going to be downgraded.
> Q Was that before you interviewed for the [B]ranch [M]anager position?
> A Yes. Yes.

> Q Tell me what—tell me the entire substance of the conversation, where did that conversation take place?
> A Bill Hopkins['] office.
> Q Who was present when Mr. Moleski made that comment to you?
> A Joe and Bill I believe. I know Joe was there, I was there, I think Bill was there.
> Q Tell me what—what other topics were discussed in that meeting?
> A I mean a whole range of things. We'd just come out of the meeting wherein they told us the [D]istrict was going to be downgraded. I really don't remember....
> Johnson Dep.Tr. 2.170:1–22.

tention will be given to fulfillment of the Affirmative Action Program objectives in the selection and development of internal candidates.

. . . . .

In determining promotability, all sources of existing information such as employee interests, performance appraisal, data and salary increase history, will be utilized. 10 October 1991 Promotion Policy, attached to Onufrak Cert. as Exhibit K.

During this time, Penske also had an Employment and Equal Opportunity policy (the "Equal Opportunity Policy") which provided: "Penske Truck Leasing will take affirmative action to ensure equal opportunity for all employees or prospective employees without regard to race, color, religion, national origin, age, sex, marital status...." 10 October 1991 Equal Opportunity Policy, attached to Onufrak Cert. as Exhibit L.

### b. *Marsiglia Preparation*

Marsiglia indicated he prepares for an interview by looking at the individual's work record and responsibilities. Marsiglia Dep. Tr. 54:2–4. Marsiglia generally reviews performance appraisals unless he knows the individual well. Marsiglia Dep.Tr. 56:1–4. During the interview, Marsiglia mentally compares and measures the traits and qualities necessary to the position with those of the interviewing Candidates. Marsiglia Dep. Tr. 55:1–5.

Marsiglia did not review any of the three Candidates' performance appraisals prior to the interview for the Branch Manager Position because he felt he knew each of the Candidates sufficiently. Marsiglia Dep.Tr. 79:19–24.

### c. *Costello Preparation*

Costello stated his decisions on hiring are based upon a person's experience, within and without the company, the person's aptitude for the job, the make-up of the position he or she is applying for, the needs of the location, the distance from the location and the performance of the candidate in the interview. Costello Dep.Tr. 72:9–24. Costello did not recall reviewing each Candidate's personnel file before the Branch Manager Position interviews. Costello Dep.Tr. 74:3–8, 88:1–8. Costello believes he spoke to Johnson's District Manager about her employment history, and knew he spoke to the District Managers for the other two Candidates about their employment history. Costello Dep.Tr. 88:9–21.

### d. *Moleski Preparation*

Moleski prepares for an interview by obtaining feedback from any earlier interviewers and speaks with the direct supervisor for the Candidate to determine the individual's performance. Opposition Brief at 13 (citing Moleski Dep.Tr. 126:22–25); Moleski Dep.Tr. 127:8–25. Moleski does not review Performance Appraisals or Candidate Rating Forms, but determines performance by contacting the Candidate's supervisor. Moleski Dep.Tr. 127:13 to 128:10.

Moleski did not recall performing any research on Raffa or Dean, other than conversations with the District Managers for each. Moleski Dep.Tr. 171:19 to 172:2. Moleski did not recall speaking with the District Manager for Johnson about her performance. Moleski Dep.Tr. 172:7–11. Moleski relied on his personal experience supervising Johnson and the recommendations of Joe Cataudella ("Cataudella"). Moleski Dep.Tr. 147:12–14. Moleski was not fully aware of all the job responsibilities Johnson held prior to her employment with Moleski. Moleski Dep.Tr. 155:13–18, 156:3–4, 156:10–24.

### 2. *Employment History of the Other Candidates*

### a. *Gene Raffa*

Raffa began working for Penske in 1975. Marsiglia Dep.Tr. 74:11–13. During his employment, Raffa held the positions of District Controller, Branch Rental Manager and Branch Manager. Marsiglia Dep.Tr. 74:17 to 76:20. Raffa held the latter two positions in Manhattan. Marsiglia Dep.Tr. 74:17 to 76:20. The Manhattan Branch Manager position was primarily focused on consumer and commercial rental, had a small lease base and almost no service department. Marsiglia Dep.Tr. 77:1–3. Therefore, the Pine

Brook location, which was a more diverse location, would have exposed Raffa to all aspects of the business. Marsiglia Dep.Tr. 76:21 to 77:6. Raffa was more than forty years old when he applied for the Pine Brook Branch Manager Position. Opposition Brief at 18 (citing Marsiglia Dep.Tr. 78:18–20).

### b. *David Dean*

Dean joined Penske in 1989 as a management trainee. Marsiglia Dep.Tr. 80:5–16. At that time, Dean worked as a Rental Representative in the Edison District, where he was responsible for handling in-person and telephone inquiries from prospective rental customers. Marsiglia Dep.Tr. 80:17 to 81:5. Dean also worked alongside the Sales Department and the Service Manager to gain familiarity with those functions. Marsiglia Dep.Tr. 80:25 to 81:7.

Following completion of his management training, Dean was promoted to District Rental Manager in New Brunswick, where he was responsible for managing the rental function, including supervising rental people working the counter, handling sales calls and managing the agent base. Marsiglia Dep.Tr. 81:8–21, 82:1–18.

In October 1990, Dean was reduced to a Rental Sales Representative. Marsiglia Dep. Tr. 83:1–13. The primary function of the Rental Sales Representative was to conduct personal sales calls outside of the District location. Marsiglia Dep.Tr. 84:10–25. The job primarily involved meeting with prospective and existing rental customers to discuss or manage their accounts. Marsiglia Dep.Tr. 84:12–25.

In January 1992, Dean was promoted to District Rental Manager. Marsiglia Dep.Tr. 88:20–22; Personnel File for David Dean, attached to Cerra Cert. as Exhibit E. Dean held that position for one year when he ap-plied for the Branch Manager Position. Marsiglia Dep.Tr. 89:15–22.

Between 1989 and 1993, the Performance Appraisals for Dean reflect an overall low of 2.85 and a high of 3.9.[5] Dean Performance Appraisals, attached to Onufrak Cert. as Exhibit J. The 1993 Performance Appraisal for Dean indicates he "needs to get out of the office more often" on sales calls. Dean Performance Appraisals. The 1993 Performance Appraisal also indicates that "[Dean] has come a long way within the last year" and that he "is an important part of the overall success of [the] district." [6] *Id.*

The Candidate Rating Form, dated 19 July 1993 and completed by Cataudella for Dean, rates his performance as 3's and 4's. *Id.* The Candidate Rating Form indicated the next position for Dean would be Area Rental Manager, within the time frame of three to eighteen months. *Id.* Dean's strengths were considered to be his high level drive and initiative; his area of improvement was his sales skills. *Id.*

### 3. *The Interviews*

### a. *Johnson's Interview*

The interviewers, Costello, Moleski and Marsiglia (collectively, the "Interviewers"), considered Johnson to be a qualified candidate. Costello Dep.Tr. 97:9–12, Marsiglia Dep.Tr. 73:7–18. Marsiglia stated Johnson was poised and confident during the interview. Marsiglia Dep.Tr. 124:1–2. Costello stated the interview with Johnson was pleasant, however, Johnson "came across as having an edge" and stated that she was "combative" in the interview. Costello Dep.Tr. 94:22, 95:1–8. Moleski said she was "cocky" in the interview; he was disturbed by her comment that she was going to hold her

---

**5.** The 1992 and 1993 Performance Appraisals for Dean were completed by Cataudella. The earlier Performance Appraisals were completed by an unidentified supervisor whose signature is not legible. The signature does not appear to be that of Cataudella, Moleski or Hopkins.

**6.** The Onufrak Cert. also included the 1994 Performance Appraisal for Dean evaluating his first ten months in the position of Branch Manager.

The Performance Appraisal, completed by Cataudella, indicates Dean was working at the Manhattan location. Because the 1994 Performance Appraisal was completed by Cataudella and not one of the Interviewers, and because the 1994 Performance Appraisal was not available to the Interviewers at the time of their decision, it is not relevant to this motion.

people accountable.[7] Moleski Dep.Tr. 161:1–7; 163:1–2.

The interviewers claim Johnson gave vague answers on how she intended to utilize the position to improve operations at the Pine Brook Office. Moleski Cert., ¶ 27; Marsiglia Interview Notes, attached to Onufrak Cert. as Exhibit O. Johnson claims, however, that she gave very specific answers during her interview and was commended on the answers she gave during her interview. Johnson Cert., ¶ 17. The Interviewers claim they felt Johnson would not do what needed to be done to accomplish the job.[8] Marsiglia Dep.Tr. 121:21–25. When asked to identify her weaknesses, Johnson did not recognize anything she needed to do for personal development. Moleski Cert., ¶ 27. This was of concern to the Interviewers. Moleski Cert., ¶ 27.

#### b. Dean's Interview

The Interviewers found Dean to be very confident in the interview. Marsiglia Dep.Tr. 118:7–8. The Interviewers noted Dean conceded during the interview that his sales skills needed improvement. Marsiglia Dep.Tr. 117:2–3. The Interviewers stated they were impressed with Dean's plans for developing the business, although they could not identify a particular plan which factored into their decision to promote him to the Branch Manager Position. Costello Dep.Tr. 98:2–5. Costello also stated Dean impressed him by asking for the job at the interview, which Johnson did not. Costello Dep.Tr. 98:6–17. The interview notes of Marsiglia, however, indicate Johnson "wants [the] job." Marsiglia Interview Notes, attached to Onufrak Cert. as Exhibit O.

#### c. Raffa's Interview

The Interviewers stated Raffa performance at his interview was average. Costello Dep.Tr. 99:4–12. They stated Raffa lacked self-confidence and lease sales experience. Marsiglia Dep.Tr. 112:18–25. Moleski stated the decision between Raffa and Dean was close, however, because Raffa was considered to be a seasoned employee. Moleski Dep.Tr. 189:6–15.

#### 4. The Decision

The Interviewers discussed the Candidates following the interviews. Moleski Dep.Tr. 166:6–8. They also spoke with Cataudella, who recommended Dean and Raffa, but preferred Dean. Moleski Dep.Tr. 147:5–8, 177:9–10. The Interviewers awarded the Branch Manager Position to Dean, indicating he was most qualified for the position due to his confidence, background in rental and his track record for people development. Costello Dep.Tr. 103:8–25; Marsiglia Dep.Tr. 132:22 to 133:9.

The Interviewers decided not to choose Johnson because of her poor interview performance and her lack of sales and rental experience. Moleski Cert., ¶ 26–27. The Interviewers were able to recall the names of six men who held the position of Branch Manager or District Manager without rental experience. Moleski Dep.Tr. 195:3–25, 196:1–8, 196:20–25; Costello Dep.Tr. 110:6–11.

Moleski stated Johnson may have been able to obtain a working knowledge of what was expected of Rental Managers and could have gained experience with regard to the rental functions when she helped with those duties in 1987 when her District was without a Rental Manager. Moleski Dep.Tr. 213:4–15. Costello acknowledged Johnson sometimes went on sales calls with the Lease Sales Representative and the District Manager when she was a District Controller, which may have contributed to her sales experience. Costello Dep.Tr. 117:13–21. Johnson also went on sales calls with others as a Rental Account Manager. Johnson Cert., ¶ 8. The Interviewers agreed that experience as a District Controller might

---

7. Johnson points out the negative comments of Moleski are not reflected in his interview notes, which are attached to the Onufrak Cert. as Exhibit O. The interview notes, however, are very cursory. The handwritten interview notes cover, at most, half of a page.

8. The Opposition Brief notes at this point the Candidate Rating Form for her position as District Controller stated Johnson "knows what she needs to do and finds a way to do it." Opposition Brief at 22 (quoting Candidate Rating Form, dated 23 July 1993).

assist a Branch Manager in certain functions. Costello Dep.Tr. 104:2–14.

### F. *After the Decision*

Johnson was informed of the Interviewers' decision one week after the interviews. Johnson Cert., ¶ 19. Johnson did not ask why she was not chosen for the position. Johnson Dep.Tr. 2.120:3 to 2.121:5; Moleski Cert., ¶ 28. Johnson claimed she did not inquire because she was too upset and shocked and did not wish to discuss it. Johnson Cert., ¶ 19.

On 15 December 1993, Costello called Johnson and informed her that a Branch Rental Manager position was open in Manhattan. Johnson Cert., ¶ 20. Johnson did not want the position because she did not perceive it as a step forward. Johnson Cert., ¶ 20. Johnson did not want the position because she already had rental experience, it was geographically inconvenient, and it was only available because the woman who was leaving the position was going to fill the job previously held by Dean. Johnson Cert., ¶¶ 20, 29; Marsiglia Dep.Tr. 148:8–23.

Johnson met with Marsiglia on 29 December 1993 to discuss her future with Penske. Johnson Cert., ¶ 30. Johnson never asked Marsiglia whether the Branch Rental Manager position would fill out her background for the purposes of advancement, nor what her progress would be if she took the position. Johnson Dep.Tr. 2.126:23 to 2.127:12. Johnson told Marsiglia she believed she did not get the Pine Brook Branch Manager Position because she was a woman. Johnson Cert., ¶ 32.

Johnson continued to work for a few weeks after she was not promoted. Marsiglia Cert., ¶ 26. As a result of the decision, Johnson began feeling emotionally distressed and took an extended leave of absence in January 1994. Johnson Cert., ¶ 33; Marsiglia Cert., ¶ 26. In early January 1994, Robert Carter ("Carter"), Senior Vice President of Human Resources, called Johnson on at least two occasions to discuss her future at Penske. Johnson Cert., ¶ 34. Johnson informed Car-

ter she was under the care of a doctor, would not be able to meet with him, but would communicate with him when able to do so. Johnson Cert., ¶ 34.

In January 1995, Johnson was terminated due to her failure to return to work, pursuant to Penske policy and practice. Costello Cert., ¶ 19.

### G. *Other Alleged Evidence of Discriminatory Conduct Proffered by Johnson*

Johnson contends the following circumstances demonstrate a discriminatory atmosphere at Penske.

#### 1. *Conduct of Area Vice President*

Johnson alleges Costello, the Area Vice President, made comments and acted in such a manner as to demonstrate discrimination on the basis of gender. Johnson Cert., ¶ 36. Costello allegedly told a co-worker that a woman employee did not get a raise because her husband was a lawyer and she did not need the money. Johnson Dep.Tr. 2.146:8–12. Costello one time reprimanded Johnson for not telling him Moleski's wife was pregnant. Johnson Dep.Tr. 3.75:20–24. Costello contacted Johnson and asked her for the number of a woman's clothing store, the name of which Johnson did not know. Costello replied that he thought Johnson would know the phone number because she was a woman.[9] Johnson Dep.Tr. 3.77:9–17. On another occasion, Costello informed Johnson he had a dream about her the night before, but could not tell her what it was about because he would then have a sexual harassment problem on his hands. Johnson Dep.Tr. 3.78:23 to 3.79:19.

Costello visited the Pine Brook office every four to six weeks and took the District Manager or one of his direct reports to lunch. Johnson Cert., ¶ 37. From January 1987 to December 1993, Costello took Johnson to lunch on only two occasions. Johnson Dep. Tr. 3.83:4–15; Johnson Cert., ¶ 37.

---

9. Costello believes he said "I thought you would know because you probably shop there." Costel-

lo Dep.Tr. 130:4–5.

In addition to lack of sales experience, Costello indicated one of the reasons he did not hire Johnson as a Branch Manager was because she needed to polish her people skills.[10] Costello Dep.Tr. 105:17–21. Johnson maintains her Performance Appraisals indicate she was proficient in people skills. Performance Appraisals, attached to Onufrak Cert. as Exhibit I. Costello admits he dissuaded Crystal Higgins ("Higgins"), who was interested in a Branch Manager position, because she lacked management people skills. Costello Dep.Tr. 122:17–25, 124:6–8; Moleski Dep.Tr. 217:1–15. Johnson maintains Higgins had good people skills and was the only woman in the United States to hold an Area Management title. Johnson Cert., ¶ 38. After 1993, Costello pulled Higgins from the Area Management position and placed her in a District Lease Sales Representative position, a job that Johnson maintains needed more people skills than the Area Management position. Johnson Dep.Tr. 2.149:1–11; 3.69:2–19.

Costello also alleged Karen Ritter ("Ritter") lacked people skills. Costello Dep.Tr. 125:15–17. Ritter was placed in a temporary Branch Manager position in Massachusetts. Moleski Dep.Tr. 216:2–6. Costello claims Ritter was not placed permanently in the position because she failed miserably, however Marsiglia testified it was because she did not want to relocate to Massachusetts. Costello Dep.Tr. 125:17–25; Marsiglia Dep.Tr. 59:12–29.

### 2. Statements of Other Parties

Johnson alleges that at one point she asked Marsiglia why more women were not promoted to management positions. Marsiglia did not answer, but replied that such a conversation was one best held in a bar some night after a couple of drinks. Johnson Dep. Tr. 1.240:1–15. Raffa and two other men approached Johnson after she was turned down for the Pine Brook Branch Manager Position and told her they believed her gender was a factor in the decision. Johnson Dep.Tr. 2.142:1–25.

### 3. Equal Opportunity Policy

Although Penske had distinct Equal Opportunity Policy and Promotion Policies in effect during the Pine Brook Branch Manager interviews, Johnson maintains that none of the Interviewers had an accurate knowledge of them and did not consider them in deciding who would fill the Pine Brook Branch Manager Position.[11] Opposition Brief at 30 (citing Costello Dep.Tr. 55:1–25; Moleski Dep.Tr. 117:17–25; Marsiglia Dep.Tr. 39:22–25.)

### 4. Circumstantial Evidence of Discrimination

The Penske Telephone Directory, as of December 1993, does not show any female Senior Vice Presidents or Operations, Regional Human Resource Managers, Area Vice Presidents, District Managers, Assistant District Managers or Branch Managers. Deposition of Robert Carter ("Carter Dep.Tr."), attached to Onufrak Cert. as Exhibit F, 73:21 to 75:5.[12] Except for Higgins, the Penske Telephone Directory does not record any female Area Sales Managers, Area Service Managers or Area Rental Managers.

As of November 1993, Johnson contends there were more than fifty women serving as Controller, Rental Manager and Lease Sales Representatives in the District locations alone. Opposition Brief at 30–31 (citing Penske Telephone Directory, attached to Onufrak Cert. as Exhibit M; Penske District Personnel Roster, dated November 1993, attached to Onufrak Cert. as Exhibit N). This figure does not include Branches, locations with Assistant District Managers or any oth-

---

**10.** Penske does not articulate a lack of people skills as one of the legitimate, non-discriminatory reasons for the promotional decision in its moving brief. *See* Moving Brief at 15.

**11.** Johnson cites to the depositions of Costello, Marsiglia and Moleski to support this contention. The cited depositions indicate the Interviewers did not have a firm understanding of the policy, although indicated they knew one was in place. Moleski stated he believed the policy was adopted in the early part of 1995. The citations do not indicate whether the Interviewers considered the policy in their decision.

**12.** The date of this deposition is unknown.

er sort of location. Onufrak Cert. at Exhibits M and N.

Based on the facts stated above, Johnson contends there exists a glass ceiling at Penske and that she has been discriminated on the basis of her age and gender. Opposition Brief at 31 (citing Johnson Cert., ¶ 39).

*Discussion*

### A. *Standard of Review for Summary Judgment Motions*

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether genuine issues of material fact exist and whether Penske is entitled to judgment as a matter of law. A district court may not resolve factual disputes in a motion for summary judgment. *Linan–Faye Constr. Co. v. Housing Auth.,* 49 F.3d 915, 926–27 (3d Cir.1995) ("at the summary judgment stage, 'the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial' ") (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)); *Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992) ("threshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party' ") (citations omitted).

In considering a motion for summary judgment, all evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Healey v. Southwood Psychiatric Hosp.,* 78 F.3d 128, 130–31 (3d Cir.1996); *General Ceramics Inc. v. Firemen's Fund Ins. Cos.,* 66 F.3d 647, 651 (3d Cir.1995); *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 & n. 2 (3d Cir.1983) (the court must resolve "all inferences, doubts and issues of credibility ... against the moving party"), *cert. dismissed,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984).

When the resolution of issues depends wholly upon the interpretation of specific statutory language and the applicable law, summary judgment is appropriate. *See DiBiase v. SmithKline Beecham Corp.,* 48 F.3d 719, 724 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995); *see also Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.) ("summary judgment is proper where the facts are undisputed"), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985); *Estate of Reddert,* 925 F.Supp. 261, 265 (D.N.J.1996).

In addition, when the nonmoving party bears the burden of proof at trial, the moving party is entitled to summary judgment by showing "there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554; *Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 329 (3d Cir.1995) ("[w]hen the nonmoving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial"). Once the movant demonstrates an essential element of the nonmovant's case is lacking, "the nonmovant must then respond by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the nonmoving party will bear the burden of proof at trial." *Fuentes v. Perskie,* 32 F.3d 759, 762 & n. 1 (3d Cir.1994) (citation omitted). *See also Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509; *Brewer,* 72 F.3d at 330; *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1130–31 (3d Cir.1995); *Witco,* 38 F.3d at 686. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356 (nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts"); *Gomez v. Allegheny Health Serv., Inc.,* 71 F.3d 1079, 1085 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2524, 135 L.Ed.2d 1049 (1996); *accord Siegel,* 54 F.3d

at 1130–31; *Nevets C.M., Inc. v. Nissho Iwai Am. Corp.,* 726 F.Supp. 525, 534 (D.N.J. 1989), *aff'd without Op'n,* 899 F.2d 1218 (3d Cir.1990).

"The nonmoving party creates a genuine issue of material fact if it provides sufficient evidence to allow a reasonable jury to find for him at trial." *Brewer,* 72 F.3d at 330 (citations omitted). If the nonmovant fails to make a sufficient showing regarding an essential element of its case upon which it will bear the ultimate burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted. *Celotex,* 477 U.S. at 321, 106 S.Ct. at 2551–52; *Brewer,* 72 F.3d at 330; *Siegel,* 54 F.3d at 1130–31; *see also Armstrong v. City of Dallas,* 997 F.2d 62, 67 (5th Cir.1993) ("[s]ummary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant").

As discussed more fully below, the evidence presented, viewed in a light most favorable to Johnson, does not raise a genuine issue of material fact as to 1) whether the reasons proffered by Penske for its employment decision were unworthy of credence or 2) whether a discriminatory reason was more likely than not a motivating or determinative cause for the decision. *See Fuentes,* 32 F.3d at 764. Summary judgment in favor of Penske, therefore, is appropriate.

### B. *New Jersey Law Against Discrimination*

Johnson alleges discrimination on the basis of age and gender [13] in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5–1, *et seq.* [14] The New Jersey Supreme Court has generally applied Federal case law arising under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, to cultivate standards governing the resolution of NJLAD claims. *Craig v. Suburban Cablevision, Inc.,* 140 N.J. 623, 631, 660 A.2d 505 (1995) (citing *Erickson v. Marsh & McLennan Co.,* 117 N.J. 539, 549–50, 569 A.2d 793 (1990) (acknowledging reliance by New Jersey Supreme Court on the order and allocation of proof used in Federal discrimination cases for NJLAD cases); *Shaner v. Horizon Bancorp.,* 116 N.J. 433, 437, 561 A.2d 1130 (1989) (noting influence of Federal anti-discrimination statutes on NJLAD standards); *Peper v. Princeton Univ. Bd. of Trustees,* 77 N.J. 55, 82–83, 389 A.2d 465 (1978) (commending *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) methodology as starting point for litigation under NJLAD); *Drinkwater v. Union Carbide Corp.,* 904 F.2d 853, 865 (3d Cir.1990) (stating that "New Jersey would apply the Title VII standard to claims under the NJLAD"); *Weiss v. Parker Hannifan Corp.,* 747 F.Supp. 1118, 1126 (D.N.J.1990) (stating that New Jersey Supreme Court has adopted methodology of proof used in Title VII cases when deciding NJLAD claims)). *See also, Abrams v. Lightolier, Inc.,* 50 F.3d 1204, 1212 (3d Cir.1995) ("New Jersey courts in applying the NJLAD generally follow the standards of proof applicable under the [F]ederal discrimination statutes....") (citations omitted); *Porta v. Rollins Environmental Serv. (NJ), Inc,* 654 F.Supp. 1275, 1285 (D.N.J.1987), *aff'd,* 845 F.2d 1014 (3d Cir.1988).

The Supreme Court analysis of unlawful discrimination claims brought pursuant to Title VII was presented first in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later

**13.** Johnson alleges discrimination on the basis of both age and gender. The evidence and arguments presented by Johnson appear to focus almost exclusively on the gender discrimination claim. Age and gender discrimination claims are governed by the same standard and burdens of proof, *see, e.g., Lawrence v. National Westminster Bank New Jersey,* 98 F.3d 61, 65 (3d Cir. 1996). In the interest of simplicity, the within discussion addresses the evidence collectively and does not distinguish between evidence of pretext for gender discrimination and evidence of pretext for age discrimination.

**14.** The purpose of the NJLAD is to ban discrimination "because of race, creed, color, national origin, ancestry, age, sex, marital status, familial status, ... liability for service in the Armed Forces of the United States, or nationality...." N.J.S.A. 10:5–3.

clarified in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *McDonnell Douglas* established the order and allocation of proofs in the litigation of an unlawful discrimination suit. *Grigoletti v. Ortho Pharmaceutical Corp.*, 118 N.J. 89, 97, 570 A.2d 903 (1990). While the New Jersey Supreme Court has not "embraced the *McDonnell Douglas* test literally, invariably, or inflexibly," it considers the test to reflect the general framework for analyzing unlawful discrimination claims. *Id.* at 98, 570 A.2d 903 (employing standard and methodology under Federal Equal Pay Act for suit brought under NJLAD on the basis of unequal wages for performance of substantially equal work). *See also Erickson*, 117 N.J. at 549–50, 569 A.2d 793.

■ Under the *McDonnell Douglas* approach, the burden of persuasion remains on the plaintiff, but the burden of going forward shifts. *Andersen v. Exxon Co., U.S.A.*, 89 N.J. 483, 492–93, 446 A.2d 486 (1982) (citations omitted); *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 & n. 4 (3d Cir.1995). The plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence. The evidence must demonstrate Johnson (1) is a member of a protected class, (2) applied and was qualified for a position for which the employer was seeking applicants, (3) was rejected despite adequate qualifications, and (4) after rejection the position was filled by someone with equivalent or lesser qualifications who was male, or sufficiently younger to create an inference of age discrimination. *McDonnell Douglas*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Andersen*, 89 N.J. at 492, 446 A.2d 486; *Peper*, 77 N.J. at 84–85, 389 A.2d 465. *See also Lawrence*, 98 F.3d at 65; *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir.1995); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir); *cert. denied*, —— U.S. ——, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995). Establishment of the *prima facie* case gives rise to a presumption that the employer unlawfully discriminated against the applicant. *Hicks*, 509 U.S. at 506, 113 S.Ct. at 2746–47; *Goodman*

*v. London Metals Exchange, Inc.*, 86 N.J. 19, 31, 429 A.2d 341 (1981).

■ The burden of going forward then shifts to Penske to rebut the presumption of discrimination by articulating some legitimate, non-discriminatory reason for its actions. *Hicks*, 509 U.S. at 507, 113 S.Ct. at 2747; *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Clowes v. Terminix Int'l, Inc.*, 109 N.J. 575, 596, 538 A.2d 794 (1988); *Andersen*, 89 N.J. at 492, 446 A.2d 486; *Goodman*, 86 N.J. at 31, 429 A.2d 341; *Peper*, 77 N.J. at 83, 389 A.2d 465; *Lawrence*, 98 F.3d at 66. Penske need not persuade the court it was actually motivated by the proffered reasons. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Fuentes*, 32 F.3d at 763. Once Penske fulfils its burden, the presumption of discrimination "drops from the case." *Hicks*, 509 U.S. at 507, 113 S.Ct. at 2747; *Burdine*, 450 U.S. at 255 & n. 10, 101 S.Ct. at 1095 & n. 10.

■ Johnson is charged with the final burden of proving that the legitimate non-discriminatory reason offered by Penske was not the genuine reason for the employment decision, but merely a pretext for discrimination. *Hicks*, 509 U.S. at 507–08, 113 S.Ct. at 2747–48; *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *Andersen*, 89 N.J. at 492, 446 A.2d 486; *Goodman*, 86 N.J. at 32, 429 A.2d 341; *Peper*, 77 N.J. at 83, 389 A.2d 465. Johnson carries the ultimate burden, which remains with her at all times, of proving that Penske engaged in intentional discrimination. *Hicks*, 509 U.S. at 507, 113 S.Ct. at 2747; *Erickson*, 117 N.J. at 550, 569 A.2d 793.

For the purposes of its Motion for Summary Judgment, Penske has assumed Johnson established evidence sufficient to support a *prima facie* case of gender and age discrimination. Moving Brief at 23, 38. In support of its burden of going forward, Penske claims Johnson was not promoted to the Pine Brook Branch Manager Position because the Interviewers determined Johnson was not the best qualified candidate for the position. Moving Brief at 24 (citing Moleski Cert., ¶¶ 19–20; Marsiglia Cert., ¶¶ 17–18; Costello Cert., ¶¶ 10–11). Penske claims the unanimous choice for hiring Dean was based upon two main factors. First,

Penske claims Dean had more rental experience and more outside sales experience with customers than Johnson. Moving Brief at 15. Second, Penske claims Johnson did not perform well in her interview, when compared with the performance of Dean. *Id.* Penske argues Johnson has not and cannot prove that the legitimate, non-discriminatory reasons offered by Penske for its employment decision are pretext. Penske, therefore, moves for judgment as a matter of law.

## C. *Standards For Pretext*

■■■ Once Penske meets its burden through the articulation of a legitimate, non-discriminatory basis for its decision, the burden of production shifts back to Johnson to prove by a preponderance of the evidence that Penske's stated reasons were a pretext for discrimination. *Hicks,* 509 U.S. at 510–11, 113 S.Ct. at 2748–49; *Burdine,* 450 U.S. at 252–55, 101 S.Ct. at 1093–95; *Lawrence,* 98 F.3d at 66 (citing *Sempier,* 45 F.3d at 728); *Brewer,* 72 F.3d at 330; *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 522–23 (3d Cir.1992), *cert. denied,* 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993). In order to prevail at trial, Johnson must show both that the proffered reason was false *and* that discrimination was the real reason. *Hicks,* 509 U.S. at 515, 113 S.Ct. at 2751–52 ("a reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason"); *Seman v. Coplay Cement Co.,* 26 F.3d 428, 433 & n. 9 (3d Cir.1994) (stating that "[r]ejection of the employer's proffered reasons, without a finding of discrimination, is insufficient to warrant judgment for the employee").

The *Hicks* decision modified Third Circuit decisions which suggested the plaintiff's ultimate burden of proving intentional discrimination could be satisfied merely by disproving the defendant's proffered reasons or showing that they were unworthy of credence. *Seman,* 26 F.3d at 438 & n. 13 (citations omitted). *See, e.g., Ezold,* 983 F.2d 509, 522 (3d Cir.1992); *Billet v. CIGNA Corp.,* 940 F.2d 812, 816 (3d Cir.1991); *Turner v. Schering-Plough Corp.,* 901 F.2d 335, 341–42 (3d Cir.1990); *Fowle v. C & C Cola,*

*Div. of ITT–Continental Baking Co.,* 868 F.2d 59, 62 (3d Cir.1989); *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 898 (3d Cir.), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). *See also McKenna v. Pacific Rail Service,* 32 F.3d 820, 828 (3d Cir.1994) (predicting the adoption of *Hicks* clarification for proving pretext discrimination by New Jersey Supreme Court); *Kelly v. Bally's Grand, Inc.,* 285 N.J.Super. 422, 432, 667 A.2d 355 (App.Div. 1995). At trial, "[i]t is not enough ... to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Hicks,* 509 U.S. at 519, 113 S.Ct. at 2762. This standard is altered, however, when a plaintiff seeks to defeat an employer's motion for summary judgment. *See Lawrence,* 98 F.3d at 66; *Sempier,* 45 F.3d at 731; *Torre v. Casio,* 42 F.3d 825, 832 (3d Cir.1994); *Fuentes,* 32 F.3d at 764.

In *Fuentes,* the Third Circuit constructed the basic framework to defeat summary judgment when a defendant answers a plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action. 32 F.3d at 764. A plaintiff must discredit the proffered reason through the submission of "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; *or* (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* (emphasis added) (citations omitted). *See also Slohoda v. United Parcel Serv., Inc.,* 207 N.J.Super. 145, 155, 504 A.2d 53 (App.Div. 1986), *certif. denied,* 104 N.J. 400, 517 A.2d 403 (1986) ("in carrying [the] burden of persuasion plaintiff ... may succeed ... either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence").

■■■ Because the issue in dispute rests on whether discrimination motivated the employer, it is not sufficient for Johnson merely to show Penske's decision was wrong. Rather, Johnson must demonstrate that the rea-

sons proffered are either unworthy of credence or that discrimination was more likely than not a motivating or determinative cause of the employment decision. *Fuentes,* 32 F.3d at 765; *Armbruster v. Unisys Corp.,* 32 F.3d 768, 782–83 (3d Cir.1994). If Johnson has adduced evidence sufficient to cast substantial doubt on the proffered reasons, however, she need not additionally come forward with evidence beyond the *prima facie* case, to survive summary judgment. *Brewer,* 72 F.3d at 331; *Fuentes,* 32 F.3d at 765.

In a motion for summary judgment, the evidence presented must not be weighed, but must be considered to determine whether it casts sufficient doubt on the proffered reasons to create a genuine issue of material fact. *Lawrence,* 98 F.3d at 67. The type of evidence required in a pretext case need not be overt or direct. Rather, it must be competent evidence to demonstrate the reason offered by the employer for the decision was, in fact, a ruse for discrimination. *Fuentes,* 32 F.3d at 764, *Stinson v. Delaware River Port Auth.,* 935 F.Supp. 531, 541 (D.N.J. 1996) (in order to avoid summary judgment, a plaintiff must submit evidence from which a factfinder could reasonably conclude the proffered reasons were fabricated). This burden reflects the inherent tension between the proliferation of civil rights, and "society's commitment to free decisionmaking by the private sector in economic affairs." *Ezold,* 983 F.2d at 531.

■ An employer must be granted substantial discretion to exercise subjective judgment in the rendering of employment decisions, especially where, as here, the success of the business is largely dependant upon the individual occupying the position. *See Burdine,* 450 U.S. at 259, 101 S.Ct. at 1096–97 (anti-discrimination statutes were not intended to "diminish traditional management prerogatives"); *Price Waterhouse v. Hopkins,* 490 U.S. 228, 242, 109 S.Ct. 1775, 1786, 104 L.Ed.2d 268 (1989) (emphasizing that an "important aspect of [Title VII] is [the] preservation of an employer's remaining freedom of choice"); *see also Brewer,* 72 F.3d at 332 ("an employer may have any reason or no reason for discharging an employee so long as it is not a discriminatory reason").

■ The Third Circuit has stated an employee's own view of her performance, or a court's view of an employee's performance, is not at issue in an alleged discrimination case. What is significant is the perception of the decisionmaker. *Burdine,* 450 U.S. at 259, 101 S.Ct. at 1096–97; *Brewer,* 72 F.3d at 331; *Ezold,* 983 F.2d at 528; *Billet,* 940 F.2d at 825. Absent discrimination, a company is privileged to make business judgments on an employee's status, "particularly when the decision involves subjective factors deemed essential to certain positions." *Billet,* 940 F.2d at 825 (citing *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1220 (3d Cir.1988), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989)).

Accordingly, to defeat summary judgment, Johnson must point to evidence tending to show Penske's explanation for the employment decision is pretextual. *Armbruster,* 32 F.3d at 782. To establish pretext, Johnson must point to some evidence from which a factfinder could reasonably disbelieve Penske's articulated legitimate, non-discriminatory reason or infer that discrimination was more likely than not a motivating or determinative cause of the employment action. *Brewer,* 72 F.3d at 331. Because Johnson has failed to do so, Penske's Motion for Summary Judgment is granted.

### D. *Application to this Case*

To survive Penske's Motion for Summary Judgment, Johnson must 1) "present sufficient evidence to meaningfully throw into question" Penske's proffered reasons for not promoting her or 2) "come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause" of Penske's decision. *Fuentes,* 32 F.3d at 765. In *Fuentes,* the Circuit provided examples of evidence for both standards. *Id.*

To achieve the first standard, Johnson "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences or contradictions" which would diffuse the

proffered reasons as being "unworthy of credence". *Id.* To achieve the second standard, Johnson may present evidence to demonstrate that Penske had previously "subjected [her] to unlawful discriminatory treatment, that [Penske] treated other, similarly situated persons not of [the] protected class more favorably, or that [Penske] has discriminated against other members of [the] protected class or other protected categories of persons." *Id.*

In the instant matter, the Interviewers believed Johnson to be a qualified candidate for the position. Costello Dep.Tr. 97:9–12, Marsiglia Dep.Tr. 73:7–18. The Interviewers, however, *unanimously* considered Dean to be *better* qualified. Moleski Cert., ¶ 20; Marsiglia Cert., ¶ 18; Costello Cert., ¶ 10. Penske has advanced several reasons for this decision: Johnson lacked outside sales experience with customers; Johnson lacked experience managing a rental department; and Johnson performed poorly at the interview. Moving Brief at 35. In comparison, Dean spent essentially his entire career at Penske in rental sales and rental management. Dean had more rental management experience and more outside sales experience than Johnson. Moving Brief at 15.

Johnson does not appear to directly contest the proffered reasons of Penske for the employment decision, but rather contends her background made her better qualified for the position. Opposition Brief at 34–35; Johnson Dep.Tr. 2.183:14–15. Johnson fails to come forward with evidence to meaningfully throw into question the proffered reasons or from which a trier of fact could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the decision.

1. *Alleged Indirect Evidence of Pretext*

a. *Rental and Sales Experience Comparison*

██ Johnson contends she can demonstrate discrimination by indirectly presenting evidence which calls into doubt the reasons Penske cites for the decision. Opposition Brief at 37. Johnson compares her experience and record at Penske with that of Dean.

Johnson contrasts her years at the Pine Brook location, which she alleges made her "uniquely familiar with all facets of the operation at Pine Brook" to Dean's "limited experience" which "included only positions dealing with the Rental Management department of the business." Opposition Brief at 35. Johnson argues "Dean's experience and performance record, when compared with [Johnson's], belie [Penske's] claim that Dean was chosen because he was better qualified." Opposition Brief at 37. It is his experience in rental area, however, which elevated Dean to be the preferred candidate.

The Branch Manager at Pine Brook is responsible for managing, developing and training the staff, including the Branch Rental Manager, the Lease Sales Representative and the Branch Service Manager. Marsiglia Cert., ¶ 13. Dean held a Rental Manager position for more than three years and served an additional nineteen months in the capacity of a Rental Representative and a Rental Sales Representative. Reply Brief at 11–12. In addition, Dean had a track record for developing trainees and getting those people promoted to positions of greater responsibility. Moleski Cert., ¶ 24.

In contrast, Johnson assisted in the performance of the Rental Management functions for a period of six to eight months while Pine Brook sought a full time Rental Manager. Johnson worked approximately five months as an 800 Line Reservationist and nine months as a Rental Account Manager. Johnson accompanied the Area and District Rental Managers and Lease Sales Representatives on sales calls and worked with the Rental Manager when she held the position of District Controller. Johnson, however, never held a position in a formal Rental Management capacity.

Based on the comparison, Johnson has not presented a genuine issue of material fact regarding whether Penske's asserted reasons for not promoting Johnson were pretextual. The evidence adduced does not constitute "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of cre-

dence." *Fuentes,* 32 F.3d at 765 (citation and internal quotations omitted). Indeed, Johnson admitted in her deposition Dean had an advantage over her in the rental arena. Johnson Dep.Tr. 2.183:8–20.[15]

In addition to rental management experience, outside sales experience was considered to be an important asset for determining who would fill the Branch Manager Position. Moving Brief at 27 (citing Moleski Cert.; ¶ 23; Marsiglia Cert., ¶ 21; Costello Cert., ¶ 15). The Branch Manager would be personally responsible for engaging in direct sales activities with new and existing customers and developing sales growth. Moleski Cert., ¶ 14. This responsibility was especially important in the Pine Brook location, which had been downsized due to the lack of sales growth. Moving Brief at 26; Costello Cert., ¶ 4. The Branch Manager would have to work with and develop the Branch Rental Manager and Lease Sales Manager in sales techniques. The Branch Manager was also responsible for dealing with customers and satisfying the customers with regard to all areas of the business (including lease, sales, service and administration). Moleski Cert., ¶ 14.

Johnson's strengths were in the administrative and financial functions of the business, which were no longer going to be performed at the Pine Brook location. Johnson had little experience in outside sales. Moleski Cert., ¶ 26, Marsiglia Cert., ¶ 24, Costello Cert., ¶ 18. Although she attended seminars and accompanied others on sales calls, Johnson never occupied a sales position as a full time job.

Dean held the position of Rental Sales Representative for more than one year, in which he conducted personal sales calls almost exclusively. As a Rental Manager, Dean was responsible for involving himself in face-to-face sales. Dean held the Rental Manager position for more than three years at the time of the decision for the Branch Manager Position. *Compare Brewer,* 72 F.3d at 332 (finding pretext where a factfinder could find it implausible that Quaker State would have fired Brewer for minor deficiencies when he was highly successful in sales, a key area identified by Quaker State's own performance incentive program); *Ezold,* 983 F.2d at 509 (finding no pretext where employer claimed it had denied partnership to the plaintiff because of her deficiencies in the area of legal analysis and where there was no question that the plaintiff suffered from serious shortfalls in that critical area).

Johnson did not have the experience Dean had in the sales area. A reasonable factfinder could not find the decision to hire Dean over Johnson on the basis of sales experience to be implausible.[16] Even assuming the experience obtained by Johnson was comparable to that of Dean, given the latitude afforded employers in their employment decisions, it cannot be said the proffered reasons are pretextual. Johnson has not demonstrated a genuine issue of material fact regarding whether the reasons asserted by Penske were pretext for discrimination. A trier of fact could not rationally disbelieve the articulated reason proffered by Penske or believe that discrimination was more likely than not

---

**15.** The relevant portion of the deposition referring to this admission is as follows:

Q Did you think that your three months as a 1–800 reservation line reservationist and your three months as a rental account manager gave you a better rental background than Dean had, for example—
A No.
Q In terms of being a branch manager?
A No. But I felt my overall background was better.
Q Did you think your rental background was the equal of Dean's rental background?
A No.
Johnson Dep.Tr. 2.183:8–20.

**16.** Johnson does not argue in her brief that Dean's sales experience is pretext for Penske's

employment decision. Penske argues summary judgment in its favor is appropriate because Johnson has failed to meet her burden requiring her to rebut every legitimate non-discriminatory reason offered by Penske. The Third Circuit has stated, however, "[i]f the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder" because the "rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough" to undermine those remaining rationales. *Fuentes,* 32 F.3d at 764 & n. 7. Summary judgment is not granted here because of Johnson's failure to rebut every proffered reason.

a motivating or determinative cause of the Penske decision based upon this evidence.

### b. *Performance History Comparison*

 Johnson also contrasts her Performance Appraisals and Candidate Rating Forms with those of Dean. Johnson argues she was "consistently rated very highly" while his performance rating "was less than exemplary." Opposition Brief at 35. Johnson also submits the Candidate Rating Forms indicate Johnson was immediately ready for a promotion to Branch Manager, but Dean needed some time before he was qualified for the position of Area Rental Manager. Opposition Brief at 35.

While it may be argued the evidence offered by Johnson may indicate the decision by the Interviewers was not "wise, shrewd, prudent, or competent," it is not evidence from which a factfinder could reasonably disbelieve Penske's legitimate, non-discriminatory reasons or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *See Fuentes,* 32 F.3d at 764–65. *See also Turner,* 901 F.2d at 343–44 (close proximity between the positive evaluation and negative evaluation of plaintiff's performance did not raise a material issue of fact as to whether performance was true reason for demotion); *Healy,* 860 F.2d at 1215 (award of promotion does not suggest weaknesses are absent or would not be important in evaluating a more demanding position).

"Pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations." *Ezold,* 983 F.2d at 528 (citations omitted). On their face, a discrepancy between the Performance Appraisals and the Candidate Rating Forms of Johnson and Dean may exist. The Performance Appraisals and Candidate Rating Forms of Johnson and Dean, however, were completed by different supervisors who rated Johnson and Dean in different capacities.

Without weighing the contents of the evidence, a review of the Performance Appraisal and the Candidate Rating Form suggests the procedure is based upon standards which may be defined differently by the individual appraiser. What is considered by one supervisor to be average work and which earns a rating of 4, might be considered by another supervisor to be substandard work, earning a rating of 2. The philosophy of the individual supervisor is reflected in the appraisals. Moleski, supervisor for Johnson, appears to have been a more generous commentator in the appraisals than Cataudella, supervisor for Dean.

The discrepancy between the Performance Appraisals appears to be the difference in the position or area of employment. What is considered to be good work by an employee occupying a lower position, will not necessarily translate into good work by an employee at a higher position. *See Healy,* 860 F.2d at 1215. The variance is further enlarged when different supervisors are rating different employees in different capacities.

"[T]he question is whether the record could support an inference the employer did not act for a non-discriminatory reason." *Lawrence,* 98 F.3d at 67 (citing *Sempier,* 45 F.3d at 732). A factfinder could not reasonably find the Interviewers unanimous choice to hire Dean was pretext based upon Johnson's submission of the Performance Appraisals and Candidate Review Forms. The Performance Appraisals and Candidate Review Forms do not raise a genuine issue of material fact as to whether Penske's proffered reason for the employment decision was pretext. *Cf. Fowle,* 868 F.2d at 66–67 (Favorable job assessments did not raise a genuine issue of material fact as to whether defendant's proffered reason was pretext. Assessments were made of plaintiff while he occupied the position of Product Line Manager and did not address leadership ability or the management skills required for the promotion to Vice President, Director of Marketing).

Here, the proffered reasons for the adverse employment decision were not based on alleged poor work performance by Johnson. Accordingly, Johnson's reliance on her favorable Performance Appraisals fails to rebut or cast doubt upon the proffered reasons,

giving rise to an inference of pretext. Unless Penske relied on Johnson's poor work performance as an articulated justification, evidence of good performance does not refute or cast doubt upon Penske's legitimate, non-discriminatory reasons for the employment decision. *See Brewer,* 72 F.3d at 338 (Roth, J., dissenting). The performance of Johnson was not an articulated reason for the adverse employment decision. On the contrary, the superior potential of Dean, as documented at the time of the decision, was the basis for the decision. Dean had obtained direct experience in areas considered to be important in performing the Branch Manager Position. As well, the Interviewers stated Dean performed better in the interview.

### c. *Interview Comparison*

■■■ Johnson further argues the proffered reason that Dean performed better in the interview as a basis for the decision is also pretext. Johnson contends there are inconsistencies that make this reason offered by Penske unworthy of credence. Opposition Brief at 39.

Specifically, Johnson notes the Interviewers claimed Dean was confident and that he gave them specific plans regarding what he was going to do as Branch Manager, but that they could not recall what those plans were. One Interviewer indicated Johnson was poised and confident, but another stated she was cocky and combative. The Interviewers indicated she was vague, but Johnson alleged the interview notes for Johnson's plans for the position were more comprehensive than the other two Candidates. Finally, one Interviewer claimed to be disturbed by Johnson's remark that she would hold her people accountable, but Johnson submits Dean was rated highly on one appraisal for holding his people accountable. Johnson argues these are inconsistencies which throw doubt on the reason proffered by Penske. *Id.*

All of the Interviewers indicate Johnson did not perform well in the interview.[17] All of the Interviewers stated Dean did perform well in his interview. An interview is a subjective procedure. How an employee presents himself or herself at an interview is often a determining factor in awarding a position. The importance of the interview is likely heightened in the placement of management positions requiring skills in the sales area. A trier of fact could not reasonably find from the evidence presented by Johnson that the proffered reason of Penske was unworthy of belief, or that the reason was more likely motivated by discriminatory animus. The evidence does not give rise to genuine issue of material fact as to whether there exists such "weaknesses, implausibilities, inconsistencies or contradictions in [Penske's] proffered legitimate reason for its action...." *Brewer,* 72 F.3d at 331 (citations omitted).

The Performance Appraisals of Dean indicate he is highly motivated, personable and had a positive attitude. His entire career at Penske was spent dealing with the public. Indeed, Dean's 1990 Performance Appraisal indicates he passed a public speaking course, for which he was nominated for awards by his peers in the class. The interview notes of Moleski and Marsiglia indicate Dean was very confident. The record does not "support an inference that the employer did not act for a non-discriminatory reason." *Lawrence,* 98 F.3d at 67. Johnson has failed to present evidence to cast doubt on the proffered reason that Dean performed better on the interview, and, therefore, received the promotion.

Johnson's opinion of her interview performance is not relevant. What is critical is the perception of the Interviewers. *See Billet,* 940 F.2d at 825. Johnson's allegation of pretext with regard to her poor interview performance is unfounded. The evidence proffered does not raise a genuine issue of material fact. It does not demonstrate that discrimination was more likely than not a motivating factor in the Penske decision, nor does it cast doubt upon Penske's legitimate, non-discriminatory reason to defeat summary judgment.

---

**17.** This deficiency was communicated to Johnson by Marsiglia in a meeting held shortly after the decision was rendered. *See* 29 December 1993 Notes of Marsiglia, attached to Onufrak Cert. as Exhibit P.

## 2. *Alleged Direct Evidence of Pretext*

### a. *Statistical Evidence*

 Johnson further argues she can prove by direct evidence that discrimination motivated Penske in making its decision for the Pine Brook Branch Manager Position. She presents evidence through the Penske Telephone Directory and Penske Personnel Roster that, although many women were employed in positions from which Branch and District Managers were selected, no female had ever been appointed to a position of Branch Manager or higher in the entire national Penske organization at the time Johnson was denied the position. Opposition Brief at 36. Johnson claims such statistical evidence, which reflects an absence of representation in management by a protected group, "is sometimes alone sufficient to support judgment for the plaintiff." Opposition Brief at 36 (citing *Equal Employment Opportunity Comm'n v. O & G Spring and Wire Forms Specialty Co.*, 38 F.3d 872 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995) (citations omitted)). Discretion is employed, however, in determining the value and validity of statistics. *O & G Spring and Wire Forms*, 38 F.3d at 876.

Although a plaintiff in a disparate treatment case is not precluded from introducing statistical evidence as circumstantial evidence of discrimination, it is ordinarily not dispositive. *Abrams*, 50 F.3d at 1217 (citations omitted).[18] Johnson relies upon the Penske Telephone Directories and Penske Personnel Rosters to formulate her statistical evidence.

From the record, the Penske Telephone Directories and Penske Personnel Rosters relied on by Johnson may be incomplete. *See* Carter Dep.Tr. 35:8–10, 36:17–24, 73:6–11. The accuracy of the evidence is further questioned in the record. The record demonstrates at least two women have held high ranking positions as of December 1993. Higgins was employed as Area Rental Manager and Ritter occupied a temporary position as Branch Manager in Massachusetts.

Accuracy aside, the statistical evidence tendered by Johnson lacks probativeness because it fails to include the gender composition of the qualified applicant pool for any of the jobs in which Johnson claims women are underrepresented. Reply Brief at 3–4. If qualified members of the protected class do not apply for the position, it is difficult to make a valid, if not compelling, accusation against a company which does not have a strong representation of minority classes in upper management.

The evidence presented by Johnson does not reflect how many promotions were available during the relevant period, the number of qualified female applicants for the positions or how many qualified female applicants were denied the position. Johnson has submitted little more than raw numerical comparisons which are not probative of any alleged discriminatory motive. *See Ezold*, 983 F.2d at 543 (finding plaintiff's reference to the small number of women admitted to the firm partnership alone is not probative of discriminatory motive); *O & G Spring and Wire*, 38 F.3d at 876–77 ("[d]etermining the relevant labor market is an essential step in determining whether there are any statistically significant deviations between the market and the employer's hiring patterns"); *Bhandari v. AT & T., Inc.*, No. Civ. 85–1753, 1990 WL 13099, at *6 (D.N.J. 14 Feb. 1990) ("plaintiffs' invocation of raw numbers concerning the gender composition of defendants' workforce falls short of producing a triable issue that defendants' legitimate, non-discriminatory reason for not retaining plaintiffs as district managers was a mere pretext for discrimination").

Absent an analysis of either "the qualified applicant pool or the flow of qualified candidates over a relevant period of time" the evidence presented by Johnson is not useful. *Ezold*, 983 F.2d at 543; *Smithers v. Bailar*, 629 F.2d 892, 899 (3d Cir.1980). Although statistical evidence in a pretext case need not be "finely tuned," *Abrams*, 50 F.3d at 1217, a trier of fact could not reasonably conclude

---

**18.** Johnson relies on *Abrams* to support the contention that plaintiffs, in general, may introduce statistical evidence in proving pretext in individual disparate treatment cases. In *Abrams*, the plaintiff used charts to demonstrated underrepresentation. The charts, however, were not relied on as statistical evidence, but were used as testimonial aids at trial.

from the proffered statistical evidence that Penske's legitimate, non-discriminatory reason for the employment decision was pretextual. A factfinder could not reasonably discredit the proffered reasons offered by Penske based on the statistics; nor could a factfinder believe based upon the proffered statistics that discrimination was more likely than not a motivating or determinative cause of the employment decision.[19] *Fuentes*, 32 F.3d at 764. The statistics as presented do not create a genuine issue of material fact.

### b. Evidence of Discrepancy in Interview Preparation

■ Johnson further submits as evidence the fact the Interviewers spoke to Dean's District Manager and Raffa's District Manager to obtain a recommendation for each of them, but did not recall speaking to Johnson's District Manager. Johnson presents this as evidence that gender played a role in the decision to choose Dean over her for the Branch Manager Position. Opposition Brief at 37. The record indicates that Marsiglia did not discuss the Candidates with *anyone* prior to the interview. Opposition Brief at 16.

The record also indicates Costello believed he spoke to Johnson's supervisor about her employment history. Opposition Brief at 16. The record does indicate Moleski did speak with Dean's supervisor, Cataudella, but did not speak with Johnson's supervisor, Hopkins. *Id.* This omission, however, does not represent evidence from which a reasonable factfinder could rationally find the reasons proffered by Penske for its decision were unworthy of credence, nor does it demonstrate that discrimination was more likely than not a motivating or determinative factor in the decision. *Fuentes*, 32 F.3d at 764–65. Interestingly, Johnson did not come forth with testimony from Hopkins, or any other individuals, who would have endorsed her for the Branch Manager Position. *Compare Lawrence*, 98 F.3d at 67 (depositions of subordinates which portrayed plaintiff's perfor-

mance in a favorable light, substantiated demonstration of pretext).

Moleski served as Johnson's supervisor for more than two years. Moleski was responsible for completing several of the Performance Appraisals and Candidate Rating Forms which Johnson offers in other arguments as evidence of her competence. Moleski, as her supervisor until as late as September 1992, had first hand knowledge of Johnson's work ethic. He also had a general knowledge of her responsibilities in previous positions. Moleski Dep.Tr. 154:14 to 157:12. Accordingly, the failure of Moleski to speak with Johnson's current supervisor does not create a genuine issue of material fact as to whether the reasons proffered by Penske are pretextual.

### c. Evidence of Equal Opportunity Policy Violation

■ Johnson infers in the fact portion of her brief that the Interviewers' unfamiliarity with the Equal Opportunity Policy and Promotion Policy at Penske at the time of the interviews is further evidence of pretext. The Third Circuit has recognized "evidence that the employer violated its own affirmative action plan may be relevant to the question of discriminatory intent." *Antol v. Perry*, 82 F.3d 1291, 1301 (3d Cir.1996) (citations omitted). In *Antol*, however, the Circuit noted the violation of an affirmative action plan might not be sufficient to defeat summary judgment, absent other evidence which casts doubt on the credence of the asserted reason for the employment decision. *Antol*, 82 F.3d at 1300 & n. 8.

The facts in *Antol* demonstrated a willful disregard of the affirmative action plan, which provided a preference for disabled veterans. The officials repeatedly resisted full implementation of the plan and failed to provide competitive interviews as required by the plan. In addition, there was evidence of "grossly distasteful epithets" against the plaintiff by a key decisionmaker and evidence of post-hoc justification following the rejec-

---

**19.** This reasoning may be applied to the submission of Johnson that the Interviewers were able to recall the names of six men who held the position of Branch Manager or District Manager without lease or rental experience. Opposition Brief at 24. Without the benefit of further details regarding the appointment of these positions, the evidence is not probative.

tion of the plaintiff. *Id.* at 1300. The Circuit found the combination of the affirmative action plan violation, the frequent reference to the plaintiff, a disabled veteran, as a "spasm head" and the revision of the letter justifying the decision because the original letter "wouldn't fly," was sufficient evidence from which a reasonable factfinder could infer discrimination. *Id.* at 1303. The facts in the instant matter are distinguishable.

■ A willful violation of an affirmative action plan, if combined with other evidence, may be indicative of pretext. In the instant case, however, Johnson contends the Interviewers did not have a thorough familiarity with the Equal Opportunity Policy. Without a thorough knowledge of the plan, it is difficult to argue a willful violation on behalf of the Interviewers. Moreover, the instant record is void of other such evidence which, if combined with an alleged plan violation, would "cast doubt on the credence of the asserted reasons for the defendant's employment decision...." *Id.* at n. 8. The Interviewers stated they believed Dean was the best Candidate for the position. There is no indication that, had the Interviewers been aware more thoroughly of the Equal Opportunity Policy, their choice of Dean over Johnson would be a violation of the plan.

Accordingly, the inference that the Interviewers did not have an accurate knowledge of the Equal Opportunity Policy does not create a genuine issue of material fact to preclude summary judgment. The evidence does not cast doubt on the asserted reasons for Penske's employment decision; nor does it suggest discrimination was more likely than not a motivating or determinative cause for the employment decision.

d. *Evidence of Alleged Discriminatory Comments*

■ Johnson also offers the allegedly discriminatory comments made by Costello as evidence of past conduct and comments which demonstrate a bias against women. Opposition Brief at 37. The comments to which Johnson refers are: 1) Costello told a co-worker a female employee did not get a raise because her husband was a lawyer and she did not need the money; 2) Costello reprimanded Johnson for not informing him that Moleski's wife was pregnant; 3) Costello asked Johnson for the phone number of a woman's clothing store and said he thought she would know it because she was a woman; 4) Costello told Johnson he had a dream about her but could not relay the contents because if he told her he would "have a real sexual harassment problem on my hands." Johnson also alleges discriminatory comments from Marsiglia demonstrate pretext. When Johnson asked Marsiglia why no women were promoted to management positions, Marsiglia replied such a conversation was best held in some bar after a couple of drinks.[20]

Assuming the comments were actually made by Costello and Marsiglia, they do not either discredit the legitimate, non-discriminatory reasons proffered by Penske, nor do they raise an inference that discrimination was more likely than not a motivating or determinative cause of the promotional decision. *Fuentes,* 32 F.3d at 764.

Comments 1 through 3, made by Costello, are void of any reference to gender discrimination and were not contemporaneous with or made in reference to the Branch Manager Position decision. Viewed in the light most favorable to Johnson, the first comment arguably may indicate some discrimination on the basis of marital status, but it is not circumstantial evidence of pretext in a claim for gender or age discrimination.

A trier of fact could not reasonably find the dream comment made by Costello, while unprofessional and inappropriate, is evidence that discrimination was more likely than not a motivating or determinative cause of the employment decision. "Stray remarks by non-decisionmakers or by decisionmakers un-

**20.** Comment 1, concerning the raise of a female employee, was made approximately seven years prior to the employment decision. Comment 3, concerning the woman's clothing store, was made more than one and a half years prior to the employment decision. Johnson Dep.Tr. 2.146:5 to 2:147:2; 3.78:2–4. Johnson could not recall when Comment 2 was made, but alleges Comment 4, the dream comment, was made in 1992 or 1993. Johnson Dep.Tr. 3.78:4 to 3.79:7. The record does not indicate when the comment by Marsiglia was made.

related to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision." *Ezold*, 983 F.2d at 545 (citations omitted). *Cf. Armbruster*, 32 F.3d at 778 ("stray remarks in the workplace, while perhaps probative of sexual harassment, cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard....") (citing *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. at 1804–05 (O'Connor, J., concurring)).

In *Armbruster*, the Third Circuit found certain comments, which were insufficient to uphold a mixed motive cause of action, were sufficient to withstand a defendant's summary judgment motion in a pretext cause of action. 32 F.3d at 783. The *Armbruster* plaintiffs alleged their employer, Unysis Corporation ("Unisys"), targeted them for termination due to their age. It was alleged Unisys masked its discrimination by transferring the plaintiffs to a new work group and then fired the group almost immediately after its formation because the group had no work. *Id.* at 771.

The evidence of pretext in *Armbruster* included comments by individuals involved with the transfer, along with specific documents containing age notations of the plaintiffs involved in the transfer. The comments concerning age were made contemporaneously with the transfer and were made by persons intimately involved in the transfer decision. The Third Circuit held the comments, taken together with the documentation, created a genuine issue as to whether the transfers and terminations of the group were age-related.[21]

In *Waldron*, the plaintiff brought a claim of age discrimination. The company's presi-

dent advised Plaintiff to lose weight because "[i]t'll make you look younger." 56 F.3d at 502. This comment was made by a decisionmaker five months before the plaintiff was terminated, but at a time when his termination was being contemplated. The Circuit held the comment, coupled with other evidence of discrimination, was one from which a reasonable jury could conclude age discrimination was more likely than not a determinative factor. *Id.*

The comments allegedly made by Costello, however, are too isolated for a factfinder to reasonably find a nexus between the comments and any potential unlawful discrimination. *Compare Wilson v. Susquehanna Township Police Dep't*, 55 F.3d 126, 128 (3d Cir.1995) (weight must be given to comments by non-decisionmaker who took an active part in personnel matters and stated "if he had to pay a woman what a man makes he wouldn't hire any women" and "there would be no woman supervisor if he had anything to do with it"). The comments, void of any reference to Johnson's employment at Penske, were not contemporaneous with the Branch Manager Position decision. Johnson testified she did not consider the most offensive comment, concerning Costello's dream, indicated Costello would discriminate against her in the future on the basis of her gender. Johnson Dep.Tr. 3.78:24 to 3.79:20.

Unlike the comments in *Armbruster*, the evidence set forth by Johnson is unsupported by other documentation that might suggest a nexus between the employment decision and the allegedly discriminatory statements, giving rise to the conclusion that age or gender was more likely than not the motivating factor in the Penske promotional decision. Unlike the *Waldron* comment, the instant remarks were not coupled with other evidence of discrimination. As well, they were made at a time before the Branch Manager Posi-

---

21. The comments included the statement of one individual who had been told to select "senior people" for the transfer, and the statements of another individual who indicated the transferees should have "seen the writing on the wall," and sarcastically answered, "Gagliardi [Unisys Vice President] wouldn't do that, would he?" When asked if age was the reason for the terminations.

The Circuit suggested another statement referring to employees "over 50 and 50" might have been further evidence of pretext. The Third Circuit stated the comments could not be disposed of as mere "stray remarks" on a pretext theory and remanded the case for further consideration. *Armbruster*, 32 F.3d at 783.

tion became available and before Johnson was competing for a promotion.

The instant comments were not made contemporaneously with the Pine Brook Branch Manager decision, nor with any reference to the Pine Brook Branch Manager decision. The instant comments did not associate Johnson with any undesirable stereotype due to her age or gender. *Compare Antol,* 82 F.3d at 1301 (decision-maker's frequent reference to plaintiff, who was a disabled veteran, as 'spasm head' could be evidence of pretext); *Waldron,* 56 F.3d at 502 (decision-maker's suggestion for plaintiff to lose weight because "[i]t'll make you look younger," coupled with other evidence, could be evidence of pretext); *Torre,* 42 F.3d at 834 (comment that one candidate for position was unacceptable because he was too old, and another comment referring to plaintiff as senile and old could lead jury to infer defendant exhibited age animus).

■ Statements about an employer's employment practices or managerial policy may be circumstantial evidence of discrimination if they demonstrate the corporate culture in which a company makes its employment decision. *Compare Brewer,* 72 F.3d at 333 (holding comment in newsletter by defendant's chief executive officer was circumstantial evidence of age discrimination when he stated "two of our star young men in their mid–40's. That age group is our future"); *see also Roebuck v. Drexel University,* 852 F.2d 715, 733 (3d Cir.1988) (racial statements made by university president who made final tenure decision were not sufficient alone to uphold a finding of discrimination, but did lend to a corporate culture).

■ The comments of Costello do not reflect a corporate culture, but only the insensitivity of one individual. The off-hand comment made by Marsiglia is too vague and unconnected to the employment decision for a reasonable factfinder to infer a discriminatory culture within the entire Penske organization. *Compare Brewer,* 72 F.3d at 334; *Ezold,* 983 F.2d at 546–47 (unprofessional comments by non-decisionmaker were insufficient to find pervasive hostility at firm to indicate partnership decision was more likely than not motivated by gender animus).

■ The comments by Moleski to Johnson after the decision to downsize the Pine Brook staff in November 1993 also do not reflect a discriminatory animus. Moleski's reference to the future of Pine Brook as a non-smoking workplace, and the statement to Johnson that perhaps it is time for her to leave, are not probative. The statements do not refer to Johnson's gender or age. Unaccompanied by further evidence, like that in *Armbruster,* the statements do not discredit the legitimate, non-discriminatory reasons proffered by Penske; they are not evidence that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employment decision. *See Gomez,* 71 F.3d at 1085 (reference to plaintiff in letter as foreigner considered to be stray remark that did not support an inference of discrimination on basis of national origin).

■ The statements by Raffa and two other men who approached Johnson after she was turned down for the Branch Manager Position are also not telling. Those men told Johnson they believed her gender to be the reason she was not promoted. The comments were made by non-decisionmakers in a setting unrelated to the decision process and are not evidence of pretext. They do not create a genuine issue of material fact. The comments do not discredit the legitimate, non-discriminatory reasons proffered by Penske; they are not evidence that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

e. *Evidence of Alleged Differential Treatment*

■ Johnson's contention that Costello failed to take her to lunch when he visited her office does not indicate the proffered reasons for the decision of Penske to hire Dean over Johnson are not worthy of credence or that the decision was more likely motivated by discrimination. The fact is too tenuous to support a finding of pretext by a reasonable trier of fact.

Johnson also submits the conduct of Costello toward Higgins and Ritter is evidence of pretext. Costello dissuaded Higgins from applying for a branch manager position due to her "lack of people skills." Johnson maintains, however, that Higgins had excellent "people skills." Opposition Brief at 28. Johnson further submits, after 1993, Costello pulled Higgins from the position of Area Rental Manager and placed her in the position of District Lease Sales Representative. Johnson contends this position required more "people skills" than the area management position. Opposition Brief at 28–29 (citing Johnson Dep.Tr. 3.69:2–19).

This facial inconsistency is not evidence from which a reasonable trier of fact could find pretext. A review of the record reveals the move from Area Rental Manager to Lease Sales Representative was considered to be a lateral move for Higgins, not a demotion. Johnson Dep.Tr. 3.69:8–10. Costello qualified his reference to Higgins' lack of people skills to mean a lack of people skills as a manager, not as a sales representative. Costello Dep.Tr. 124:5–24. The testimony of Johnson, however, appears to comment on Higgins interaction with customers in the area of sales. Johnson Dep.Tr. 3.69:12–24. Costello does not contest Higgins had the skills to deal with customers in a sales capacity. Rather, Costello maintains Higgins was deficient when dealing with internal personnel in a management capacity. Costello Dep. Tr. 124:8–13, 125:2.

As discussed, an employer can have any reason for an employment decision, so long as it is not a discriminatory reason. *Brewer*, 72 F.3d at 332. Costello pulled Higgins from a management position due to a lack of management skills and placed her in a lateral sales position due to her superior sales skills. This is not evidence that Penske discriminated against another member of the protected class. As well, it does not support Johnson's argument that the legitimate, nondiscriminatory reasons proffered by Penske for the adverse employment decision against her were pretext.

The position of branch manager, by definition, requires solid management skills. Accordingly, the submission that Costello dissuaded Higgins from pursuing a branch manager position does not call into question the reasons proffered by Penske for the decision not to promote Johnson; nor is it evidence from which a trier of fact could reasonably conclude an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision.

Costello believed he may have told Ritter she lacked "people skills." Costello also stated Ritter "failed miserably" as a temporary branch manager in Massachusetts and therefore was not considered for the full time position. Costello Dep.Tr. 125:112–24. Marsiglia testified the reason Ritter was not given the full time branch manager position in Massachusetts was because she did not wish to relocate. Marsiglia Dep.Tr. 59:12–16. Johnson submits "it seems that all of the women who had potential in the company were deemed deficient by Costello in some way." Johnson Cert., ¶ 38.

The argument, however, does not create a genuine issue of material fact to preclude summary judgment. The context within which the people skills comment was made to Ritter is not explained. As well, the failure of Costello to know the reason Ritter declined the full time branch manager position does not raise a genuine issue of material fact as to whether the reasons proffered by Penske for the failure to promote Johnson are pretextual. The evidence fails to cast doubt upon the reasons proffered by Penske or suggest that a discriminatory motive was more likely than not a motivating or determinative cause of the employment decision.

Johnson has set forth an abundance of facts in an attempt to demonstrate the legitimate, reasons proffered by Penske for the Branch Manager Position decision are pretext. The facts, taken alone or together, fall short of that needed to defeat summary judgment. The facts presented, taken together and viewed in the light most favorable to Johnson, do not constitute evidence, "direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer action." *Brewer,* 72 F.3d at 331 (citing *Fuentes,* 32 F.3d at 763–64).

Other than performance appraisals and candidate review forms, Johnson does not proffer any other evidence of her capability to perform the Branch Manager Position, giving rise to an inference of pretext.

In a recent decision, the Circuit reversed the grant of summary judgment and held the record "could support an inference the employer did not act for a non-discriminatory reason." *Lawrence,* 98 F.3d at 67. The Circuit pointed to the depositions of subordinates, which favorably portrayed the performance of the plaintiff and contradicted a memorandum that detailed several reasons why the plaintiff was fired. *Id.* Without weighing the evidence and deciding its probativeness, the Circuit held that an inference of discrimination from this evidence could be drawn.

No such inference can be drawn from the evidence presented by Johnson. The facts, as presented, fail to rebut or cast sufficient doubt upon the reasons proffered by Penske to create a genuine issue of material fact.

 Johnson was not terminated by Penske, she was not promoted. Johnson had received favorable appraisals throughout her tenure at Penske. Johnson was also awarded several promotions, at times without having to interview for the position. Johnson does not complain about her earlier treatment at Penske; there is no evidence of a history of discrimination against Johnson. This also undermines Johnson's allegations of pretext.

After the downsize at the Pine Brook office, Penske management told Johnson they would find her another job. When Johnson was not chosen for the Branch Manager Position, Marsiglia discussed the reasons with Johnson. Those reasons highlighted her lack of experience in rental and sales, and her performance at the interview.

Johnson has not revealed any post hoc justifications or conflicting explanations which contradict the reasons given to her when she first learned she was not promoted. *Compare Antol,* 82 F.3d at 1302 (revised justification letter evidence of pretext when original justification letter was discarded be-cause it "wouldn't fly" and needed to be "most persuasive"). Johnson does not appear to contend the proffered reasons are untrue, only that she felt her overall background was better for the Branch Manager Position. *See* Johnson Dep.Tr. 2.183:14–15. Johnson has not presented "sufficient evidence to cast substantial doubt upon [Penske's] proffered reason...." *Fuentes,* 32 F.3d at 765. Johnson has presented no evidence which creates a genuine issue of material fact to preclude summary judgment on either the claim of gender or age discrimination.

"If the evidence is merely colorable or not significantly probative, summary judgment should be granted." *Antol,* 82 F.3d at 1295 (citing *Armbruster,* 32 F.3d at 777 (citations omitted)). Here, the evidence would not permit a jury to find in favor of Johnson. *Id.*

An employer "may have any reason or no reason for [not promoting] an employee so long as it is not a discriminatory reason." *Brewer,* 72 F.3d at 332. Penske articulated legitimate, non-discriminatory reasons for its decision; Johnson has failed to cast doubt upon those reasons to create a genuine issue of material fact to preclude summary judgment. Accordingly, the Penske Motion for Summary Judgment is granted.

*Conclusion*

For the reasons stated above, the Penske Motion for Summary Judgment is granted.